

# Missouri Court of Appeals

## Southern District

### Division Two

FIRST NATIONAL BANK OF )
DIETERICH, f/k/a FIRST STATE )
BANK OF RED BUD, )
  )
  Plaintiff-Respondent, )
  )
v. ) No. SD33797
  )
POINTE ROYALE PROPERTY ) **Filed: June 29, 2016**
OWNERS' ASSOCIATION, INC., and )
POINTE ROYALE CONDOMINIUM )
PROPERTY OWNERS' )
ASSOCIATION, INC., )
  )
  Defendants-Appellants. )

APPEAL FROM THE CIRCUIT COURT OF TANEY COUNTY

Honorable Tony W. Williams

**<u>AFFIRMED</u>**

Pointe Royale Property Owners' Association, Inc. ("Pointe Royale") appeals a

judgment in favor of First National Bank of Dieterich ("Bank")[1] that arose from Bank's

acquisition, via foreclosure sales, of eight condominium units in Pointe Royale Subdivision

---

[1] After the case was filed, First State Bank of Red Bud merged with Bank, and we refer interchangeably to either entity as "Bank." The judgment additionally ordered Pointe Royale's co-defendant, Pointe Royale Condominium Property Owners' Association, Inc. ("Condominium Association"; collectively "the associations"), to pay Bank $11,564.80 for assessments overpaid to Condominium Association, along with Bank's related attorney's fees. Although Condominium Association sought a money judgment in one count of its amended counterclaim, and it joined in Pointe Royale's notice of appeal, Condominium Association has effectively abandoned its appeal by failing to file a brief. *See **Roseman v. Roto-Die Co.**, 947 S.W.2d 507, 510-11 (Mo. App. E.D. 1997).

("the subdivision"). The judgment declared that Bank had overpaid subdivision assessments to Pointe Royale and that Bank was entitled to attorney fees. The judgment awarded Bank monetary damages in accordance with those findings, and it dismissed as moot Pointe Royale's amended counterclaim that sought additional subdivision assessments from Bank and an award of attorney fees incurred by Pointe Royale ("counterclaim").

Pointe Royale presents four points relied on. The first and fourth points contend the trial court misapplied the law in interpreting the applicable subdivision covenants ("the covenants") because: (1) the covenants provided that "successors in interest [sic]" were obligated "to pay past due assessments" owed by previous owners, and Bank had constructive notice of the covenants; and (2) Pointe Royale was expressly permitted "to collect reasonable attorney's fees, and late fees in connection with delinquent assessments." Points two and three contend the trial court misapplied section 448.3-116[2] as to Pointe Royale's: (1) "collection of Annual and Special Assessments, because [the statute] applies only to 'associations' that consist exclusively of condominium unit owners"[3]; and (2) collection of "[a]ssessments that accrued prior to the Bank's foreclosures" because the statute addresses only the priority of liens and "does not extinguish the underlying obligation to pay assessments."

Finding no merit in any of these claims, we affirm the judgment of the trial court.

---

[2] This statute is a part of Missouri's Uniform Condominium Act. Section 448.1-101, *et. seq*. Section 448.3-116 is entitled "Lien for assessments[,]" and at the time relevant subsection 2 provided that "[a] lien pursuant to this section is prior to all other liens and encumbrances on a unit except: . . . (2) A mortgage and deed of trust for the purchase of a unit recorded before the date on which the assessment sought to be enforced became delinquent[.]" Subsection 7 provided that "[a] judgment or decree in any action brought pursuant to this section shall include costs and reasonable attorney's fees for the prevailing party." All statutory references are to RSMo 2000.

[3] Although Pointe Royale claims in its brief that condominiums were not the only type of real property contained within the subdivision, it does not direct us to any portion of the record that might support that claim.

The covenants were initially declared by the subdivision's developer and later amended in March 1986. "<u>ARTICLE X COVENANT FOR MAINTENANCE ASSESSMENTS</u>" of the covenants permitted Pointe Royale to collect annual and special assessments from those owning "a Lot, Condominium or Living Unit" in order to provide for the "'Common Elements'" of the subdivision. "<u>Section 7. Non-Payment of Assessments</u>" ("the non-payment provision") of the article states:

> If any Assessments are not paid on the date when due, then such Assessments shall become delinquent. The Association may bring an action at law against the Owner personally obligated to pay the same or foreclose the lien against the property and both actions shall be cumulative and neither shall preclude the other. No Owner may waive or otherwise escape liability for the Assessments by non-use of the Common Elements or abandonment.
>
> If Assessments have become delinquent, such Assessments shall bind such property in the hands of *the then Owner, his heirs, devisees, personal representatives and assigns* [("the lien limitation clause")]. *The personal obligation of the Owner to pay such Assessments* **shall remain** *his personal obligation* **and shall pass** *to successors in title* [("the personal liability clause")]. Such delinquent Assessments shall bear interest from the date of delinquency at any lawful rate as determined from time to time by the Board of Directors of the Association or, if not so determined, the rate of 10% per annum. In the event a judgment is obtained, such judgment shall include interest on the Assessments as above provided and a reasonable attorney's fee to be fixed by the Court, together with the costs of the action [("the attorney's fee and interest clause")].

(Italics and bolding added for emphasis.) Additional relevant language from the covenants will be addressed in the context of our analysis of Pointe Royale's points on appeal.

After the covenants were recorded, Bank made loans to the owners of eight condominium units in the subdivision ("the original owners") and secured those loans by

---

[4] Pointe Royale "does not challenge the trial court's findings of fact. Rather, [Pointe Royale] contends that the trial court erroneously applied the law[.]" At oral argument, counsel for Pointe Royale stated that although there had been "a few" disputed factual issues, those issues were not being appealed. We have garnered our summary of the relevant facts from the transcript, admitted exhibits, and a stipulation of facts by the parties made "[p]rior to trial" and adopted by the trial court.

recording first deeds of trust. Pointe Royale subsequently levied various assessments against the original owners ("the prior assessments"). When the prior assessments were not paid, Pointe Royale filed liens against those condominium units. After the original owners defaulted on Bank's loans, Bank purchased the units at foreclosure sales in 2010. Pointe Royal refused to release any liens unless Bank paid both the prior assessments and all assessments levied after Bank became the new owner of the units ("the new assessments"). Bank was willing to pay the new assessments, but it disputed its liability for the prior assessments. Bank paid both the new and prior assessments and began reselling the units. Bank then sought to recover the prior assessments and its attorney fees in a declaratory judgment suit.

The parties stipulated that Bank had "paid all sums demanded by Pointe Royale except for the attorney's fees which Pointe Royale has expended in defending this declaratory judgment action." Pointe Royale maintained that the covenants obligated Bank, as a "'successor] in title,'" to pay the prior assessments and Pointe Royale's attorney fees. Pointe Royale's counterclaim sought to: (1) retain Bank's payment of both types of assessments; and (2) recoup the attorney fees Pointe Royale incurred in collecting the assessments and defending the declaratory judgment suit.

The trial court found that section 448.3-116.2(2) and .7 "extinguished by foreclosure" the prior assessments and that Pointe Royale owed Bank $15,035.92, the amount of the prior assessments. The resulting judgment ordered Pointe Royale to pay Bank this amount, plus $3,150.00 to cover one-half of what it cost Bank to litigate the declaratory judgment action. The trial court also found that because Bank had willingly paid the new assessments, and Pointe Royale was not entitled to keep the prior assessments Bank had paid

4

under protest, Pointe Royale was also "not entitled to payment of attorney's fees, late fees, interest, and lien filing fees accruing prior to the foreclosure of the Deeds of Trust."

*Preliminary Issue Regarding Finality of the Judgment*

Bank's petition for declaratory judgment contained a second count that claimed Bank was entitled to damages for slander of title based upon the associations' filing of liens to enforce the prior assessments. The judgment found that the associations' "claims for past due assessments themselves constituted a cloud on [Bank's] title and, thus, are sufficient to support a claim for slander of title." However, the trial court "reserve[d] Count II of [Bank's p]etition for separate trial depending upon the outcome of this case on appeal, if appealed." Counsel for the parties agreed to this procedure, and the judgment explicitly declared that it was "final for the purposes of appeal in that there is no just reason for delay."

Rule 74.01(b)[5] permits a judgment on "fewer than all of the claims . . . only upon an express determination that there is no just reason for delay." Although such a declaration by the trial court is necessary, it is not determinative; this court must also consider, *sua sponte*, whether such a judgment is final for purposes of appeal. *See **Ndegwa v. KSSO, LLC**, 371 S.W.3d 798, 801 (Mo. banc 2012). The determinative issue is whether "the subject of the judgment . . . constitutes one single, yet complete, claim." ***Fischer v. City of Washington***, 55 S.W.3d 372, 377 (Mo. App. E.D. 2001).

> The "one claim" required for Rule 74.01(b) certification means one legal right, regardless of whether multiple remedies are sought. *Columbia* [*Mut. Ins. v. Epstein*], 200 S.W.3d [547,] 550 [(Mo. App. E.D. 2006)]. It means the aggregate of operative facts that give rise to a legally enforceable right. *Id.* In other words, claims are separate if they require proof of different facts and application of distinguishable law[.]

***State ex rel. Bannister v. Goldman***, 265 S.W.3d 280, 285 (Mo. App. E.D. 2008).

---

[5] All rule references are to Missouri Court Rules (2016).

For instance, in ***Robertson v. Police & Firemen's Pension Plan of City of Joplin***, 442 S.W.3d 60, 63-64 (Mo. App. S.D. 2014), the plaintiffs brought a five-count petition with the first count seeking a declaration that one of them, a firefighter, was entitled to certain disability retirement benefits. The second count alternatively sought a recalculation of benefits based upon a different term of service and the third count sought a declaration that the defendants' interpretation of the plan violated the city's charter. ***Id.*** at 63. The trial court entered judgment in favor of the firefighter on count 1, found counts 2 and 3 moot, and did not decide the remaining two counts based upon the judgment entered on Count 1. ***Id.*** at 64. The remaining two counts presented claims for damages resulting from violations of the firefighter's contract rights concerning the retirement plan under the Missouri Constitution and Title 42 U.S.C. section 1983. ***Id.*** at 63-64. In addressing whether the judgment was final for purposes of appeal, we found counts 4 and 5 to be "separate and distinct from the claim decided in the judgment." ***Id.*** at 65. The first count was decided based solely on the language of the benefit plan, and even though the calculation of the firefighter's retirement benefit was at the heart of the entire dispute, we found that the resolution of the remaining two counts "w[ould] require proof of facts wholly irrelevant to the claim decided in the instant judgment." ***Id.*** Additionally, the applicable law for the constitutional contract rights claim differed from the law regarding an interpretation of a particular contract. ***Id.***

Here, we again find that different legal rights are at issue in the two counts. "To support an action for slander of title, there must be false words that are maliciously published, causing the plaintiff to suffer a pecuniary loss or injury." ***First Nat'l Bank of St. Louis v. Ricon, Inc.***, 311 S.W.3d 857, 864 (Mo. App. E.D. 2010). Malice is established by proof that such claims were "filed not only without legal justification or excuse, but also

6

were not innocently or ignorantly made." *Id*. at 867. "Proof of falsity, alone, is not proof of malice." *Id*. Thus, while proof of each of the two counts in Bank's petition relies on a determination of the enforceability of the prior assessments against Bank, a different set of operative facts and legal principles would be necessary to determine whether, if the liens were false, they were maliciously maintained. *Cf. Robertson*, 442 S.W.3d at 66. As a result, the judgment is final for purposes of appeal.

## Standard of Review

"We will affirm the trial court's judgment unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law." *Epstein v. Villa Dorado Condo. Ass'n*, 371 S.W.3d 23, 26-27 (Mo. App. E.D. 2012). "A bench tried judgment that reaches a correct result . . . will not be set aside even if the trial court gives a wrong or insufficient reason for its judgment." *Fix v. Fix*, 847 S.W.2d 762, 766 (Mo. banc 1993). "[Q]uestions of law are reserved for the independent judgment of the appellate court and are reviewed without deference to the circuit court's determination." *Olathe Millwork Co. v. Dulin*, 189 S.W.3d 199, 203 (Mo. App. W.D. 2006). Contract interpretation is a legal question we review *de novo*, *Rowan v. Coves N. Homes Ass'n*, 426 S.W.3d 725, 727 (Mo. App. W.D. 2014), and we interpret an affirmative covenant by applying "[p]rinciples of contract law[.]" *Kehrs Mill Trails Assocs. v. Kingspointe Homeowner's Ass'n*, 251 S.W.3d 391, 396 (Mo. App. E.D. 2008). Whether a contract is ambiguous is also a question of law subject to *de novo* review. *ATC Co.*, *v. Myatt*, 389 S.W.3d 732, 735 (Mo. App. E.D. 2013).

**Analysis**

For ease of analysis, we will begin with a collective analysis of points one, three, and four, which each rely on the proposition that Bank was liable for the prior assessments. We will then address Pointe Royale's second point, which lacks this temporal distinction and presents a distinct procedural issue.

*Points 1, 3, and 4—Liability for the Prior Assessments*

Pointe Royale argues that the personal liability clause "is unambiguous and makes a property owner jointly and severally liable with the previous owner for all unpaid assessments that came due before the transfer of title to the current owner." Bank responds that it is not liable for the prior assessments because it is not a successor in title as intended in the personal liability clause.

> The primary rule of contract interpretation under Missouri law is that a court will seek to determine the parties' intent and give effect to that intent. *Chochorowski v. Home Depot U.S.A.*, 404 S.W.3d 220, 226 (Mo. banc 2013). The parties' intent is determined by giving each term its plain, ordinary, and usual meaning. *Id.*; *Kehrs Mill Trails*, 251 S.W.3d at 396. The dictionary is a good source for finding the plain and ordinary meaning of contract language; but the contract's context must be considered in applying the appropriate dictionary definition.

*Schler v. Coves N. Homes Ass'n*, 426 S.W.3d 720, 723 (Mo. App. W.D. 2014). "A contract is ambiguous only if its terms are reasonably open to more than one meaning, or the meaning of the language used is uncertain." *Care Ctr. of Kansas City v. Horton*, 173 S.W.3d 353, 355 (Mo. App. W.D. 2005). "[I]f the language is not clear, the court turns to other tools of construction in an attempt to determine the intent of the parties." *TAP Pharm. Prods. Inc. v. State Bd. of Pharm.*, 238 S.W.3d 140, 143 (Mo. banc 2007).

A subdivision covenant requiring payment for the upkeep of common or shared subdivision features is based on "a promise to perform an affirmative act, and is thus an

8

affirmative covenant." ***Kehrs Mill Trails Assocs.***, 251 S.W.3d at 396. Affirmative covenants differ from restrictive covenants, which typically restrain the use of land, ***Webb v. Mullikin***, 142 S.W.3d 822, 826 (Mo. App. E.D. 2004), but both types are essentially promises that create rights and duties in relation to particular land. ***Id.*** Thus, the specific language of the affirmative covenant is significant to the creation of specific rights and duties. Restrictive covenants have not been favored under Missouri law because they operate in derogation of a fee, ***Van Deusen v. Ruth***, 125 S.W.2d 1, 2-3 (Mo. 1938), such that "when there is any ambiguity or substantial doubt as to the meaning, restrictive covenants will be read narrowly in favor of the free use of property." ***Blevins v. Barry-Lawrence Cty. Ass'n for Retarded Citizens***, 707 S.W.2d 407, 408 (Mo. banc 1986).

Although an affirmative covenant may not be seen as directly derogating the use of land, it does run with the land. ***River Oaks Homes Ass'n v. Lounce***, 356 S.W.3d 855, 860 (Mo. App. W.D. 2012); ***Woodglen Estates Ass'n v. Dulaney***, 359 S.W.3d 508, 517 (Mo. App. W.D. 2012). "It follows, then, that . . . the new owner of the property, would be solely responsible for the post-transfer assessments[,]" ***River Oaks Homes Ass'n***, 356 S.W.3d at 860, as a covenant generally binds a party who takes property with actual or constructive notice of it, ***Woodglen Estates Ass'n***, 359 S.W.3d at 517, despite the fact that the purchasing party had nothing to do with drafting the covenants. We do not hold in this opinion that an affirmative covenant cannot be written so as to obligate a subsequent purchaser for an assessment owed by a prior owner.[6] Rather, the narrow question we must answer is whether the personal liability clause did so here.

---

[6] Whether personal liability for the prior assessments "remain[s]" with the prior owners is not at issue in this appeal, and we do not address it.

9

Pointe Royale does not present us with any definition of "successors in title" from either the covenants, a dictionary, or case law. Further, the words "joint and several liability" do not appear in the covenants, and Pointe Royale cites no authority supporting its argument that the personal liability clause is an unambiguous expression of joint and several liability instead of an inherently impossible statement that the personal liability of an owner will both "remain" and "pass[.]" Indeed, Pointe Royale acknowledges that it "could not locate any Missouri case law interpreting a covenant that uses similar language to the covenant" at issue here.[7] Instead, it unconvincingly argues that a Florida opinion addressing a subdivision's specific declaration *against* assumption of delinquent assessments by "successors in title" supports the proposition that the personal liability clause is unambiguous and enforceable against Bank.[8]

---

[7] In arguing the significance of constructive notice of the covenants to Bank's liability for the prior assessments, Pointe Royale cites *Whispering Valley Lakes Improvement Ass'n v. Franklin Cty. Mercantile Bank*, 879 S.W.2d 572, 574 (Mo. App. E.D. 1994), which reversed a partial summary judgment in favor of a bank because the "[b]ank's possible personal liability for assessments as a successor in title [was] a justiciable issue sufficient to preclude summary judgment." Concerning the language of the operative covenant, the opinion reveals only that the covenant formerly provided for a lien only for unpaid assessments and it was later amended by a majority vote of the owners "to provide that each assessment would become both a lien on the property and the personal obligation of the owner of the property." *Id.* at 573. The trial court had found that the bank was not liable for assessments because the original owner did not consent to the covenant amendment and the bank did not consent to personal liability. *Id.* at 574. The opinion does not state that the association sought collection from the bank for any assessments that became due *before* the bank foreclosed and became the owner of lots.

[8] *See* **Pudlit 2 Joint Venture, LLP v. Westwood Gardens Homeowners Ass'n**, 169 So.3d 145 (Fla. Dist. Ct. App. 2015). In **Pudlit**, the declaration provided that "'[e]ach such assessment . . . shall also be the personal obligation of the person who was the Owner of such property at the time when the assessments fell due. *The personal obligation for delinquent assessments shall not pass to his successors in title unless expressly assumed by them.*'" *Id.* at 148 (emphasis added by opinion author). The question was whether a Florida statute providing that "[*a*] *parcel owner is jointly and severally liable with the previous parcel owner for all unpaid assessments*" controlled instead of the subdivision declaration. *Id.* at 148, 151. The case provides no persuasive reasoning as to the meaning of the personal liability clause before us even though the **Pudlit** court referred to the specific clause before it as "'the [d]eclaration's plain and unambiguous language[.]'" *Id.* at 151 (quoting **Coral Lakes Cmty. Ass'n v. Busey Bank, N.A.**, 30 So.3d 579, 583 (Fla. Dist. Ct. App. 2010) (declaration absolved a bank from liability for assessments that were past due if it purchased the property at foreclosure)). This is because the language in that case operated in the other direction to prevent liability and included other specific language that is not present in the instant case, stating that "*the personal obligation . . . shall not pass . . . unless expressly assumed*[.]" *Id.* at 148. It did not matter whether the bank—who purchased the property at a foreclosure sale—was a "successor in title" because there was no other express assumption of

10

The term "successors in title" does not appear in editions of *The American Heritage Dictionary of the English Language* (New College ed. 1978) and *Black's Law Dictionary* (5th ed. 1979) (hereinafter "*Black's*") published before the non-payment covenant was recorded in 1986. Piecing together the meaning of "successors in title" from individual definitions of "successor" and "title" only emphasizes the need to consider the phrase in the full context of the covenants. *See Schler*, 426 S.W.3d at 723.[9] For instance, before *Black's* even offers a definition of "title" for purposes of "**Real Property Law**[,]" it directs the reader to multiple cross-references:

_____

liability by the bank as required by the declaration. The meaning of "successors in title" in that particular covenant was unimportant.

[9] *Black's* defined "**Successor**":

> One that succeeds or follows; one who takes the place that another has left, and sustains the like part or character; one who takes the place of another by succession. One who has been appointed or elected to hold an office after the term of the present incumbent.
>
> Term with reference to corporations, generally means another corporation which, through amalgamation, consolidation, or other legal succession, becomes invested with rights and assumes burdens of first corporation.
>
> *Singular successor*. A term borrowed from the civil law, denoting a person who succeeds to the rights of a former owner in a single article of property (as by purchase), as distinguished from a *universal* successor, who succeeds to all the rights and powers of a former owner, as in the case of a bankrupt or intestate estate.

*See supra* at 1283, citations omitted.

As for "title[,]" the section "**Real Property Law**" provided:

> Title is the means whereby the owner of lands has the just possession of his property. The union of all the elements which constitute ownership. Full independent and fee ownership. The right to or ownership in land; also, the evidence of such ownership. Such ownership may be held individually, jointly, in common, or in cooperate or partnership form.
>
> One who holds vested rights in property is said to have title whether he holds them for his own benefit or for the benefit of another.
>
> See also **Deed; Estate**.

*Black's*, *supra*, at 1331, citation omitted.

See also Abstract of title; Action to quiet title; Color of title; Cloud on title; Defective title; Disparagement of title; Doubtful title; Good title; Indicia of title; Just title; Legal title; Marketable title; Marketable Title Acts; Merchantable title; Muniments of title; Non-merchantable title; Onerous title; Owner; Ownership; Paramount title; Possession; Recording acts; Torrens title system; Worthier title.

*Supra* at 1331.

Viewing the phrase in "the context of the entire agreement," ***ATC Co.***, 389 S.W.3d at 735, we first note that "successors in title[,]" is not included in "ARTICLE I DEFINITIONS[,]" and it is not used anywhere else in the covenants. Lacking an ordinary or specific definition, and no other applied context from which to determine its meaning, we conclude that the phrase "successors in title" as used in the personal liability clause is ambiguous, and we will look to the covenants generally for aid in construing its intended meaning.

The words "successor" and "successors" are also not defined in the covenants, but they are used to broaden Pointe Royale's express power to collect payment for the "Sewer Collection System and Sewage Treatment Plant." The phrase "successors and assigns" is also not defined, but it is used throughout the covenants in connection with the subdivision developer and Pointe Royale, as well as in two parts of the last article of the covenants addressing miscellaneous matters.[10] By using the term "successors in title" only once in a document that contains many other uses of "successors," and still other uses of "successors

---

[10] "ARTICLE XVII MISCELLANEOUS PROVISIONS" provides that "[t]he covenants and restrictions of this Declaration shall run with and bind the land and shall inure to the benefit of and be enforceable by [Pointe Royale] or the Owners subject to this Declaration, their respective legal representatives, heirs, successors and assigns, for a [specified] term[.]" Additionally, the final section of Article XVIII states: "All provisions set forth herein shall extend to and be binding on the respective legal rep[r]esentatives, heirs, successors and assigns of all parties mentioned herein where consistent with the context hereof." It would be inconsistent to also extend personal liability for delinquent assessments to all of those named in the final section, especially legal representatives "of all parties[,]" when the personal liability clause affirmatively specifies who, other than "Owner[,]" is to be so bound.

and assigns," we conclude that "successors in title" was intended to denote a subset of the larger category of "successors."

We then glean the intended scope of that subset from the context of the paragraph that contains the personal liability clause, particularly the lien limitation clause. While it is true that a lien against property is not the same thing as holding someone personally liable for a debt, the concepts are nonetheless joined together in describing Pointe Royale's remedies under the portion of the covenants that addresses the non-payment of assessments. The lien limitation makes it clear that not every potential source of recovery for unpaid assessments will be included. The property itself can be bound only when it is "in the hands of the then Owner, his heirs, devisees, personal representatives and assigns."[11] Property removed from an owner and held by someone not included in this list, such as an adverse possessor or purchaser at a foreclosure sale, is not expressly bound. If the burden against the primary basis for an assessment—the property itself—is limited, it is reasonable to conclude that the reach of personal liability would be more limited, not expanded. Inasmuch as the lien limitation was restricted to those having some relationship with the original owner as *his* heir, devisee, personal representative or assign—and not based on a mere relationship to *the* property—we see no indication that the personal liability clause was intended to reach beyond the relationships specified for purposes of liens so as to extend

---

[11] We note that Pointe Royale does not specifically reply to Bank's argument that as the purchaser at the foreclosure sales, it is not an "assign" of the original owners because: (1) the property owner remains the owner until her breach triggers foreclosure under the power of sale in a deed of trust, *see Tipton v. Holt*, 610 S.W.2d 659, 661 (Mo. App. W.D. 1981); and (2) a deed of trust does not shift title to either the trustee or mortgagee, but creates a lien for the mortgagee. *See Libby v. Uptegrove*, 988 S.W.2d 131, 132 (Mo. App. W.D. 1999) (citing Todd, Foreclosures of Deeds of Trust at 7-8 (3d ed. 1996)). *Cf. P.M.K., Inc. v. Folsom Heights Dev. Co.*, 692 S.W.2d 395, 396-97 (Mo. App. W.D. 1985) (mortgagee/purchaser at foreclosure sale was not bound by leases executed after the deed of trust was executed as there was no evidence in the record that the mortgagor made assignments to the purchaser); *Lowery v. First Nat'l Bank of St. Louis*, 895 S.W.2d 200, 202 (Mo. App. E.D. 1995) (discussing in the context of joint tenancy that one tenant's pledge does not sever the tenancy because, unlike an assignment, "[a] pledge of property as security is not a conveyance").

personal liability to a successor removed from any personal relationship with the original owner.

Further, when other means of construing an ambiguous contract provision fail, we construe the unclear provision against the party that drafted it. *AB Realty One, LLC v. Miken Techs., Inc.*, 466 S.W.3d 722, 731 (Mo. App. E.D. 2015); *Disabled Veterans Tr. v. Porterfield Constr., Inc.*, 996 S.W.2d 548, 552 (Mo. App. W.D. 1999) ("any ambiguity in a written instrument should be construed against the party which drafted the ambiguous language"). Thus, even if our attempt to construe the ambiguous language is inadequate, the fallback position would also produce a narrow construction of the personal liability clause against Pointe Royale. *Cf. Blevins*, 707 S.W.2d at 408. And, while the covenant at issue is admittedly an affirmative one instead of a restrictive covenant derogating a particular use of land, we nonetheless appreciate the fact that extending personal liability to successors with no personal relationship to the original debtor would make such property less desirable to buyers and thus make it more difficult to convey the property. Point 1 is denied.

Pointe Royale's third point claims the trial court erred in relying on section 448.3-116 in finding that Pointe Royale was not entitled to keep Bank's payment of the prior assessments. Because the trial court reached the correct result in finding Bank not liable for the prior assessments, the question of whether the statute would require such a result is moot and we do not address it. *See Fix*, 847 S.W.2d at 766.

Pointe Royale's fourth point claims the trial court erred in relying on section 448.3-116 when it found that Pointe Royale "was not entitled to attorney's fees, late fees, and interest incurred in connection with the collection of [the prior assessments.]" Because the non-payment provision in the covenants that provided for the recoupment of attorney fees

14

and interest was predicated on the procurement of a judgment in Pointe Royale's favor, and Pointe Royale has failed to obtain such a judgment, this point is also moot and will not be addressed.

*Pointe Royale's Second Point—Application of Section 448.3-116*

Pointe Royale's second point challenges the application of section 448.3-116 to its collection of subdivision assessments from Bank, stating:

> The trial court erred in finding that Section 448.3-116 of the Missouri Uniform Condominium Act applied to [Pointe Royale's] collection of Annual and Special Assessments, because Section 448.3-116 applies only to "associations" that consist exclusively of condominium unit owners, in that [Pointe Royale] is an association that consists of residential lot owners and condominium unit owners.

The first paragraph of the argument supporting this point insists that section "448.3-116 does not prohibit or limit [Pointe Royale] from recovering past due assessments and does not entitle the Bank to attorney's fees. In fact, [this section] is inapplicable to [Pointe Royale's] collection of assessments because [Pointe Royale] is not an 'association' subject to the Missouri Uniform Condominium Act." The final sentence of the argument reiterates the argument that it was error to apply section 448.3-116 to the prior "assessments and to award [Bank] attorney's fees pursuant to [s]ection 448.3[-]116(7)."

To the extent that the point addresses the collection of the prior assessments, it is moot because the trial court reached the correct result for the reasons earlier stated.[12] To the extent that the argument following the point challenges the trial court's award of Bank's attorney fees, the point itself includes no such challenge. It claims only that section 448.3-

---

[12] We do not regard this point as alleging reversible error as to Pointe Royale's entitlement to the new assessments because the argument does not develop such a contention, *cf.* ***Mallow v. State***, 439 S.W.3d 764, 771 n.4 (Mo. banc 2014) (when a portion of a point is not developed in the argument portion of the brief, it "may be considered to be abandoned"), and no materiality is demonstrated given the stipulation of fact and finding of the trial court that Bank paid the new assessments. *Cf.* ***Black v. Rite Mortg. & Fin., Inc.***, 239 S.W.3d 165, 169 (Mo. App. E.D. 2007) (a reversal demands not only a demonstration of error, but prejudice, also); *see also* Rule 84.13(b).

116 applies to Pointe Royale's collection of assessments; it says nothing about *Bank's* entitlement to recover anything, and it does not mention any claim for *attorney fees*. "We only address questions stated in the points relied on. **Smith v. Taylor Morley, Inc.**, 929 S.W.2d 918, 923 (Mo. App. [E.D.] 1996). Issues raised in the argument portion of the brief which do not appear in the points relied on are not preserved for appellate review." **Benoit v. Mo. Highway & Transp. Comm'n**, 33 S.W.3d 663, 672 n.4 (Mo. App. S.D. 2000).

Pointe Royale's second point is also denied, and the judgment of the trial court is affirmed.

DON E. BURRELL, P.J. – OPINION AUTHOR

NANCY STEFFEN RAHMEYER, J. – CONCURS

WILLIAM W. FRANCIS, JR., J. – CONCURS